UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

BARBARA MASON,

             Intervention Plaintiff,

       -v-

JAMIE MUSIC PUBLISHING CO. d/b/a
DANDELION MUSIC CO., *et al.*,

             Intervention Defendants.

-------------------------------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/16/09
```

No. 05 Civ. 9922 (BSJ)(JCF)

## OPINION AND ORDER

    Before this Court is a motion for summary judgment brought by Intervention-Plaintiff Barbara Mason ("Mason") against Jamie Music Publishing Co. d/b/a/ Dandelion Music Co., *et al.* ("JMP" or "Dandelion" or "Plaintiff/Intervention Defendants") (collectively "Defendants").[1] This action arises out of a dispute over the ownership of the copyright in a musical composition, "Yes I'm Ready" (the "Composition"), that Mason wrote in 1965.[2] Mason seeks a declaratory judgment that she is the owner of the

---

[1]    Mason brings this action as an intervention plaintiff, pursuant to Fed, Rule Civ. P. 24(b). On December 15, 2006, Mason filed a motion to intervene as a plaintiff pursuant to Rule 24 of the Federal Rules of Civil Procedure. (*See* No. 05 Civ. 9922, Doc. No. 18.) This motion was granted pursuant to an order issued by the Honorable James C. Francis IV, Magistrate Judge, on April 12, 2007. (*See* No. 05 Civ. 9922, Doc. No. 32.) Mason filed her complaint as an intervention plaintiff ("Mason's Complaint") on May 3, 2007. (*See* No. 05 Civ. 9922, Doc. No. 33.)

[2]    The underlying action involves a copyright infringement action, which was filed on November 23, 2005, by Plaintiff/Intervention Defendant JMP, Dartown, Inc. d/b/a Stilran Music, and Jamie Record Company against, Roc-A-Fella Records, LLC, Island Def Jam Music Group, Universal Music Group, Inc., Diplomatic Man, Inc., Camero Giles d/b/a Killa Cam Music, Juelz Santana, Jimmy Jones d/b/a the Diplomats, Gregory Omar Green and Seon Thomas d/b/a Heatmakerz Music ("JMP's Complaint"). (*See* JMP's Complaint (annexed as Ex. 1-E to March 28, 2008, Decl. of Frank Lipsius ("Lipsius Decl.")), No. 05 Civ. 9922, Doc. No. 50-11.)



copyright to the Composition and she petitions the Court to deny JMP's request for a declaratory judgment of ownership in its own name.[3]  (Mem. in Supp. of Mason's Mot. For Summ. J. ("Mason's Mem.") at 1.)  Mason's motion is based upon claims arising under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and the Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1338(b).  For the reasons stated below, Mason's motion is granted.

S<small>UMMARY</small> J<small>UDGMENT</small>

A grant of summary judgment is appropriate only if "there are no genuine issues of material fact and the moving party establishes its right to judgment as a matter of law." EMI Catalogue P'ship v. Hill, 228 F.3d 56, 61 (2d Cir. 2000) (citing Fed. R. Civ. P. 56(c)); <u>see also</u> Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When deciding a motion for summary judgment, "all ambiguities must be resolved and all reasonable inferences drawn in favor of the party opposing the motion." <u>See</u> EMI Catalogue P'ship, 228 F.3d at 61 (citing <u>Anderson</u>, 477 U.S. at 255).

---

[3]      While Mason only seeks declaratory relief in the instant motion for summary judgment, she seeks monetary damages and attorney's fees in her intervention complaint.  (*See* Mason's Complaint at the Wherefore Clause.)  In their response to Mason's Complaint, Defendants seek, *inter alia*, a declaratory judgment of copyright ownership to the Composition.  (*See* Intervention Defs.' Answer to Intervention Compl. And Countercl. Against Intervention Pl. ("Defs.' Answer") at ¶ 67 & the Wherefore Clause.)

FACTUAL BACKGROUND[4]

Mason is the sole author of the song and lyrics to the Composition, which she wrote in early 1965 when she was seventeen years old. (Decl. of Barbara Mason in Support of Mot. For Summ. J.[5] ("Mason Decl.") ¶¶ 2-3.) At that time Mason resided with her parents in Philadelphia, Pennsylvania. (*Id.* at ¶ 3.) In April 1965, the Philadelphia Orphan's Court (the "Orphan's Court") appointed Norman A. Jenkins, Esq. as guardian ("Jenkins" or the "Guardian") for Mason, who was still a minor.[6] (*See* April 30, 1965 Decree (the "April 30 Decree"), (annexed as Ex. 1 to February 23, 2007, Decl. of Chuck Rubin in Support of Mason's Mot. to Intervene ("Rubin Decl.")), No. 05 Civ. 9922, Doc. No. 30.) The Orphan's Court required that "[a]ll proposed contracts on behalf of the said minor [Mason] shall be submitted to this Court for approval prior to execution by the Guardian, copies of which proposed contracts shall be attached to a Petition requesting approval thereof and authority to be given the Guardian for execution thereof . . . ."[7] (*Id.*) Jenkins submitted a petition to the Orphan's Court to authorize execution of the following three agreements on Mason's behalf: (1) a recording agreement with Artic Record Co. (the "Recording Agreement"); (2) a management agreement with James Bishop (the "Management Agreement"); and (3) an author's and

---

[4]     The material facts summarized below are undisputed unless otherwise noted. Any fact that has been submitted by a party in its statement of uncontested facts, pursuant to Local Rule 56.1(a), and that has not been specifically controverted by the opposing party, is deemed admitted for purposes of the instant motion. See Local R. 56.1(c).

[5]     Mason's declaration is not dated.

[6]     The Petition for the Appointment of a Guardian (the "Guardian Petition"), which was annexed to the April 30 Decree, states that Mason was born on August 9, 1947. (Guardian Petition (annexed as Ex. 1 to Rubin Decl.) at ¶ 1.)

[7]     The Composition was written before the Guardian was appointed. (Mason Decl. ¶ 7; *see also* Defs.' Rule 56.1 Statement at 3-4.)

3

composer's Contract with Stilran Music & Dandelion Music Co. (the "Songwriter's

Agreement") (collectively the "Agreements"). (*See* Petition to Authorize Execution of

Agreements to the Orphan's Court (the "Authorization Petition"), (annexed as Ex. 1 to

Rubin Decl.))[8] The Orphan's Court directed Jenkins to execute the Agreements by

decree dated June 3, 1965 (the "June 3 Decree"), which stated that copies of the

Agreements were attached to the Guardian Petition. (*See* June 3 Decree (annexed as Ex.

1 to Rubin Decl.).)  The Agreements were the only written contracts that were approved

by the Orphan's Court and that Jenkins executed on Mason's behalf with JMP.  (Defs.'

Rule 56.1 Statement at 7.)

     The Songwriter's Agreement was executed by Mason and Stilran Music &

Dandelion Music Co. on May 21, 1965.[9] (JMP's Local Rule 56.1 Statement at 6; Rubin

Decl. Ex. 1.)  The Songwriter's Agreement provided that Mason agreed to "sell, transfer,

assign and deliver to [Dandelion and Stilran] all music, melodies, lyrics, verses, songs

and musical compositions that [Mason] shall write and/or compose during the term

hereof and any extensions and renewals thereof . . . ."  (Songwriter's Agreement

(annexed as Ex. 1 to Rubin Decl.) at ¶ 1.)  The Songwriter's Agreement provided for an

initial one-year term that commenced on May 21, 1965, and terminated on May 20, 1966,

and it included two successive options for one-year renewal terms.  (Songwriter's

Agreement ¶ 2.)  The Songwriter's Agreement also stated that Mason would assign her

rights to any previously composed songs that were mentioned on an attached list of

---

[8]    The Authorization Petition, which is not dated, states that it is submitted pursuant to the April 30 Decree. (Rubin Decl. Ex. 1.)

[9]    The certified copy of the Songwriter's Agreement that was filed with the Orphan's Court was not signed by Mason's Guardian.  (Rubin Decl. ¶ 7 & Ex. 1.)

musical songs and compositions marked as Schedule B.[10]  (*Id.* at ¶ 7.)  Schedule B was

never filed with the Orphan's Court and none of the documents on file with the Orphan's

Court contain any mention of the Composition.  (Rubin Decl.  ¶¶ 6-7 & Ex. 1; Defs. Rule

56.1 Statement at 7-8.)

Prior to the appointment of the Guardian and to the execution of the Songwriter's

Agreement, Defendants filed an application to register the copyright to the Composition

with the United States Copyright Office (the "Copyright Office").  The Copyright Office

issued a copyright registration certificate dated March 31, 1965, which listed Dandelion

Music Co. and Stilran Music as claimants and Barbara Mason as author.  (*See* March 28,

2008, Decl. of Frank Lipsius ("Lipsius Decl.") at Ex. 1-C.)  Defendants obtained a

subsequent copyright registration certificate from the Copyright Office dated July 15,

1965.[11]  (*Id.*)  In 1993, Mason renewed the copyright to the Composition in her own

name and received renewal registration certificates from the Copyright Office dated

January 8, 1993.[12]  (Mason's Rule 56.1 Statement ¶ 3; Mason Decl. ¶ 9 & Exs. 1, 2.)

On May 1, 2007, Mason entered into a written agreement (the "Purchase

Agreement") with Embassy Music Corporation ("EMB"), in which EMB agreed to

purchase Mason's one hundred percent worldwide copyright interest in and to the

Composition.  (*See* Purchase Agreement (annexed as Ex. L to March 28, 2008, Decl. of

---

[10]    Specifically, paragraph 7 of the Songwriter Agreement provides: "Attached hereto and marked
Schedule B is a list of all songs and musical compositions written and/or composed prior to the term hereof,
but as to which you hereby give and grant us the same rights as though they had been written and/or
composed during the term hereof."

[11]    The Copyright Office issued copyright registration certificates Nos. EU 875465 (March 31, 1965)
and EP 205076 (July 15, 1965).  (Lipsius Decl. at Ex. 1-C; Mason's Compl. ¶ 26.)

[12]    The Copyright Office issued renewal registration certificates Nos. RE-617-406 and RE-617-407.
(Mason's Compl. ¶ 28; Mason Decl. Exs. 1, 2.)

Roger Juan Maldonado ("Maldonado Decl.")) at ¶¶ 1-2; Mason Dep. (annexed as Ex. A

to Maldonado Decl.) at 206:9-207:15).)  On May 3, 2007, Mason filed a complaint

against JMP and other defendants that asserted, *inter alia*, causes of action for copyright

infringement and for a declaratory judgment of copyright ownership in the

Composition.[13]  Mason filed the instant motion for summary judgment on March 18,

2008.

DURATION OF COPYRIGHT PROTECTION

  The Copyright Act provides that "Copyright in a work protected under this title

vests initially in the author or authors of the work." 17 U.S.C.A. § 201(a).  Works

created before 1976 were subject to the protection of the 1909 Copyright Act (the "1909

Act").[14]  *See* Nimmer on Copyright [hereinafter Nimmer], § 1-OV (2009); 17 U.S.C. 1.

Works created under the 1909 Act that complied with the proper requirements of

statutory notice were entitled to statutory copyright protection for a total of fifty-six years

— an initial term of 28 years plus a second twenty-eight year renewal term.[15]  *See* 3-9

---

[13]  The Complaint, which is dated May 2, 2007, named as defendants JMP, Dartown, Inc. d/b/a Stilran Music, and Jamie Record Company, Roc-A-Fella Records, LLC, Island Def Jam Music Group, Universal Music Group, Inc., Diplomatic Man, Inc., Cameron Giles d/b/a Killa Cam Music, Juelz Santana, Jimmy Jones d/b/a The Diplomats, Gregory Omar Green and Seon Thomas d/b/a Heatmakerz Music.  (*See* Mason's Compl; *see supra* n. 1.)

[14]  Under the 1909 Act, applicable to works created before January 1, 1978, *see* 17 U.S.C. § 301(b)(2), state common law copyright provided protection until first publication, and thereafter the work was entitled to an initial 28-year term of statutory copyright, provided that adequate statutory notice was given at publication, or appropriate registration and deposit were made, 17 U.S.C. §§ 2, 10, 12, 19, 21, 24 (repealed); *see Shoptalk, Ltd. v. Concorde-New Horizons Corp.*, 168 F.3d 586, 590 (2d Cir.1999) . . . If adequate statutory notice was given, then application for renewal made during the last year of the initial term would extend the copyright for a renewal term of 28 additional years.  17 U.S.C. § 24 (repealed).

*Martha Graham Sch. and Dance Found., Inc. v. Martha Graham Ctr of Contemporary Dance, Inc.*, 380 F.3d 624, 632-33 (2d Cir. 2004) (footnote omitted).

[15]  "The 1976 Act created a unitary term for works created after January 1, 1978, and works that were unpublished and unregistered on January 1, 1978. *See* 3 Nimmer § 9.05[A][2]. For works that were either

6

Nimmer § 9.11. The 1909 Act was superseded by the Copyright Act of 1976 (the "Copyright Act"), which became effective on January 1, 1978.[16]  *See* 17 U.S.C. §§ 101 *et seq.*; Nimmer § 1-OV.[17]  Any pre-1978 cause of action is governed by the 1909 Act,[18] "whereas the new law is effective as to subsequently arising undertakings."[19]  Nimmer § 1-OV.

DISCUSSION

Mason asserts that she is the undisputed author of the Composition and that she owns the copyright, which initially vests in the composer of a musical composition. *See* 17 U.S.C.A. § 201(a).  Mason further asserts that she never assigned her copyright to Defendants and that she filed the copyright renewal registration to the Composition in 1993 pursuant to her statutory right of renewal as its author.  Defendants advance several theories under which the Court should find that ownership of the copyright in the

---

in their initial or renewal term on January 1, 1978, the 1976 Act extended the renewal period by nineteen years, but still required timely renewal. *See* 17 U.S.C. § 304, historical and statutory notes (H.R. Rep. 94-1476 (1976))." *Martha Graham Sch. and Dance Found., Inc.*, 380 F.3d at 633.  In 1998, Congress passed the Sonny Bono Copyright Term Extension Act ("CTEA"), which extended for an additional twenty years the copyright in all subsisting works that had achieved statutory copyright under the 1909 Act.  9 Nimmer § 9.11.  "Any copyright still in its renewal term at the time that the Sonny Bono Copyright Term Extension Act becomes effective [effective Oct. 27, 1998] shall have a copyright term of 95 years from the date copyright was originally secured."  17 U.S.C.A. § 304(b).  Therefore, the Composition is entitled to a ninety-five year term of protection from its initial creation in 1965 since it was still in its statutory renewal period when the Sonny Bono Sonny Bono Copyright Term Extension Act took effect.

[16]    Title 17 of the United States Code, entitled "Copyrights", was "amended in its entirety" by Pub. L. 94-553, Oct. 19, 1976, 90 Stat. 2541.

[17]    Under the 1976 Act, "[a]ny copyright, the first term of which is subsisting on January 1, 1978, shall endure for 28 years from the date it was originally secured."  17 U.S.C.A. § 304(a)1(A).

[18]    Section 112 of Pub. L. 94-553 provides: "All causes of action that arose under Title 17 before January 1, 1978, shall be governed by Title 17 as it existed when the cause of action arose."

[19]    In this Opinion, all citations are to the Copyright Act of 1976 unless otherwise indicated.

Composition was assigned by Mason to JMP.[20] Defendants assert that the 1965

Songwriter's Agreement assigned the Composition to Defendants and they urge the Court

to consider extrinsic evidence to interpret the Songwriter's Agreement, which they

acknowledge is incomplete.  Defendants also assert that their 1965 registration of the

copyright is prima facie evidence of their copyright ownership and they dispute that

Mason's renewal registration of the Composition establishes her ownership in the

Composition.  Defendants allege that Mason lacks standing to seek a declaratory

judgment with respect to her ownership of the copyright because she has assigned her

rights in the Composition.  Lastly, Defendants assert that the equitable doctrines of laches

and estoppel bar this action.

I.      Standing

        A court's determination of whether a plaintiff has standing "is antecedent to any

declaratory judgment determination. A court must first satisfy itself that 'the facts

alleged, under all the circumstances, show that there is a substantial controversy, between

parties having adverse legal interests, of sufficient immediacy and reality to warrant the

issuance of a declaratory judgment.'" *Tasini v. New York Times Co.*, 184 F. Supp. 2d 350,

356 (S.D.N.Y. 2002) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312

U.S. 270, 273 (1941))**.**  Under § 501(b) of the 1976 Copyright Act, which "merely

codified the case law that had developed under the 1909 Act with respect to the beneficial

owner's standing to sue[,] . . . '[t]he legal or beneficial owner of an exclusive right under

---

[20]      Defendants claim that Mason assigned the initial copyright in the Composition to JMP and
Dartown, Inc., d/b/a/ Stilran ("Stilran"), a former plaintiff in the underlying copyright action who is not
named as an intervention defendant in the instant motion. (*See* Defs.' Mem. at 5.) Stilran was listed on the
initial 1965 copyright registration as a claimant along with JMP. (Defs.' Mem. at 6.) Stilran was
terminated as a party to the underlying action on March 3, 2006, pursuant to an order of stipulation and
dismissal, and is not named as a party in the instant motion. (*See* No. 05 Civ. 9922, Doc. No. 14.)

a copyright' is entitled to sue for infringement." *Cortner v. Israel*, 732 F.2d 267, 271 (2d
Cir. 1984) (quoting 17 U.S.C.A. § 501(b)).  "A 'beneficial owner' for this purpose would
include, for example, an author who had parted with legal title to the copyright in
exchange for percentage royalties based on sales or license fees."  *Id.*  (citing the
legislative records of the Act and quoting H.R. Rep. No. 1476, 94th Cong., 2d Sess. 159,
*reprinted in* 1976 U.S. Code Cong. & Ad. News 5659, 5775 (internal quotations
omitted)).  The Second Circuit has held, therefore, that "[w]hen a composer assigns
copyright title to a publisher in exchange for the payment of royalties, an equitable trust
relationship is established between the two parties which gives the composer standing to
sue for infringement of that copyright. . . .  Otherwise the beneficial owner's interest in
the copyright could be diluted or lessened by a wrongdoer's infringement."  *Id.* (internal
citations omitted).

  According to Defendants, Mason lacks standing to seek a declaratory judgment
with respect to her ownership of the copyright because she has assigned her copyright
interest in the Composition to EMB, which is not a party in this action.  (Defs.' Mem. at
2, 16.)  Defendants proffer evidence of Mason's testimony about the Purchase Agreement
that she executed in May 2007 with EMB, which states that Mason agrees to transfer and
assign to EMB "an undivided one hundred percent (100%) of [her] worldwide copyright"
ownership and rights of renewal in the Composition, along with her interest in "all claims
and causes of action" arising from the Composition prior to the Purchase Agreement.
(*See* Purchase Agreement ¶¶ 1.2, 2.1, 2.5; Mason Dep. (annexed as Ex. A to Maldonado
Decl.) at 206:9-25; 207:2-15.)

Mason asserts that she has standing to prosecute this action because (1) EMB has not yet completed its purchase of her interest in the Composition pending resolution of this action, and (2) notwithstanding any assignment to EMB, Mason remains a beneficial owner of the copyright. (Mason's Reply Mem. at 7-9.) Mason proffers the testimony of John Castaldo, EMB's controller, and Jay Berger, who negotiated the Purchase Agreement on her behalf, that Mason and EMB had agreed that she "would prosecute in her own name with her own counsel the Intervention Action," and that "at the conclusion and/or resolution of the Intervention Action, EMB would then accept her assignment of her one hundred percent (100%) worldwide copyright interest to effectuate the Purchase Agreement.  Also consistent with that understanding, EMB has not paid the purchase price specified in Paragraph 7.1 . . . ."[21]  (*See* April 4, 2008, Decl. of John Castaldo ("Castaldo Decl.") at ¶¶ 1, 5-7; Berger Dep. (annexed as Ex. M to Maldonado Decl.) at 64-65.)

Based on the testimony and evidence proffered by the parties to the Purchase Agreement, as well as the language of the Agreement itself, the Court concludes that the Purchase Agreement has not been fully executed and that Mason has not yet assigned her

---

[21]   Mason testified that she has entered into the Purchase Agreement with EMB and that an initial payment of ten thousand dollars was paid to her by Artists Rights Enforcement Corp. ("AREC") as a result of that agreement. (Mason Dep. 206:9-207:4; 211:16-23.)  The Purchase Agreement provides:

> In consideration of all of the rights and interests to be acquired by EMB . . . EMB shall pay to [Mason], upon the complete execution of this Agreement, the sum equal to a thirteen (13) multiple of the NPS (Net Publisher's Share) of the gross income derived from licensing of the composition "Yes I'm Ready" actually received during the last five years, less related Third Party Obligations and excluding advances, legal and royalty settlements and other adjustments relating to prior periods."

(Purchase Agreement ¶ 7.1.)  In addition, the Purchase Agreement calls for an advance payment of twenty thousand dollars to be paid on Mason's behalf to Artists Rights Enforcement Corp.  ("AREC") prior to the complete execution of the agreement.  (*Id.* at ¶ 7.2.)

rights to EMB. "In the construction of copyright assignments, as with contracts and other writings, the meaning to be placed on the words of the assignment ultimately turns upon the intention of the parties to the agreement. . . . That intention is to be determined from the evidence submitted to the court, including the agreement itself, statements and actions of the parties contemporaneous with and following the agreement, oral testimony, affidavits, depositions, and other equally competent evidence." *Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 747 n.7 (2d Cir. 1975) (internal citations omitted).

In addition, the Purchase Agreement provides that Mason will receive songwriter royalties according to a stated royalty percentage schedule. (*See* Purchase Agreement, ¶¶ 8, 8.1-8.8.) As such, Mason will retain a beneficial ownership of the copyright interest once EMB becomes the legal owner of the copyright in the Composition. Accordingly, the Court finds that Mason has standing to bring this action.

II.    Assignment of Copyright Ownership

The Copyright Act defines a "transfer of copyright ownership" as "an assignment, mortgage, exclusive license, or any other conveyance . . . of a copyright or of any of the exclusive rights comprised in a copyright . . . but not including a nonexclusive license."[22] 17 U.S.C.A. § 101; *Time, Inc. v. Kastner*, 972 F. Supp. 236, 238-39 (S.D.N.Y. 1997). "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and

---

[22]    "[1] Pre-1978 Grants of Statutory Copyright. Section 28 of the 1909 Act provided that a copyright might be 'assigned, granted, or mortgaged' but that this could be done only 'by an instrument in writing signed by the proprietor.' A copyright license, as distinguished from an assignment, could be made orally, or could be implied from conduct. This was true under the 1909 Act of both exclusive and nonexclusive licenses." 3-10 Nimmer § 10.03 (footnotes omitted).

signed by the owner of the rights conveyed or such owner's duly authorized agent."[23]  17

U.S.C.A. § 204(a); *see also Martha Graham Sch. and Dance Found., Inc.*, 380 F.3d at

643 ("A valid assignment of statutory copyright must be in writing.").  The Copyright

Act recognizes only two exceptions to the writing requirement for a valid transfer of

copyright ownership: (1) a nonexclusive license, and (2) a transfer by operation of law.

*Time, Inc.*, 972 F. Supp. at 238-39 (holding that oral agreements failed to effect a valid

transfer of copyright ownership).

   The Court must consider two issues in determining whether Mason is entitled to

the declaratory judgment of copyright ownership that she seeks:  (1) whether Mason

assigned her initial copyright ownership in the Composition in 1965 pursuant to the

Songwriter's Agreement and/or related writings; and (2) whether Mason assigned her

statutory right to renew that interest upon the expiration of the first twenty-eight year

term of copyright protection.

   A.   The Songwriter's Agreement

   Defendants assert that the Songwriter's Agreement included an assignment of

Mason's copyright interest in the Composition because (1) Mason's guardian, Jenkins,

---

[23]      The Court notes that the Second Circuit has held that an oral transfer that was subsequently
memorialized in writing may be a valid transfer of a copyright ownership. *See Khan v. Leo Feist, Inc.*, 165
F.2d 188, 191-92 (2d Cir. 1948) ("The assignment of the song and of the right to copyright it . . . was oral,
but later [the composer] . . . reduced the assignment to writing . . . . Defendants contend that the assignment
. . . was invalid because it was not made in writing at the time of oral agreement therefor. But the writing,
like the memorandum of an oral agreement under the statute of frauds, we regard as sufficient to satisfy the
British Copyright Law by confirming the prior oral assignment." (footnotes omitted)); *see also Dan-Dee
Imports, Inc. v. Well-Made Toy Mfg. Corp.*, 524 F. Supp. 615, 618 (D.C.N.Y. 1981) (citing *Khan* as
"supporting the proposition" that the "requirements of 17 U.S.C. § 204(a) can be satisfied by an oral
assignment later ratified or confirmed by 'a note or memorandum of the transfer,'" and noting that
"Professor Nimmer has interpreted the addition of 'a note or memorandum of the transfer' in new 17
U.S.C. § 204(a), as a codification of the holding in *Khan*, Nimmer on Copyrights, § 10.03(A) at 10-34
(1981) (quoting §204(a)).  The Ninth Circuit has also recognized that the requirement of a written
confirmation of a transfer signed by the copyright owner under § 204(a) "can be satisfied by an oral
assignment later confirmed in writing." *Stewart Title of California, Inc. v. Fidelity Nat. Title Co.*, 279 F.
App'x 473, 475 (9th Cir. 2008).

"informed Mason that the Songwriter's Agreement included musical compositions that Mason had composed prior to [the] execution of the [Songwriter's Agreement]," and (2) the Songwriter's Agreement also assigned prior compositions that were listed on a Schedule B and that were by incorporated into the Songwriter's Agreement by reference in paragraph seven. (Maldonado Decl. ¶ 4(d); Defs.' Mem. 5-6.) Defendants acknowledge that the Songwriter's Agreement that was filed with the Orphan's Court did not contain a Schedule B but they assert that the Songwriter's Agreement is "incomplete and . . . susceptible to the interpretation that 'Yes, I'm Ready' was one of the compositions transferred to JMP, even though it is not specifically mentioned in the Agreement." (Defs.' Mem. at 5-6.)

Mason proffers evidence that the file copy of the Songwriter's Agreement that was entered on behalf of Ms. Mason as a minor with the Orphans' Court of Philadelphia County (the "Orphan's Court"), "does not make any mention of the composition 'Yes I'm Ready'; nor does it contain anything titled 'Schedule B.'" (Rubin Decl. ¶ 6 & Ex. 1.)

As Defendants concede, the only written contracts that were entered into by JMP and Mason's Guardian are those documents that were specifically approved by the Philadelphia Orphan's Court. (*See* Defs.' Rule 56.1 Statement at 7; Rubin Decl. ¶ 5 & Ex. 1.) It is undisputed that the Orphan Court's file copy of the Songwriter's Agreement does not contain a Schedule B that identifies Mason's prior compositions and that none of the documents that were filed with the Philadelphia Orphan's Court include any mention of the Composition. (Defs. Rule 56.1 Statement at 8; Rubin Decl. Ex. 1.) Indeed, Defendants do not claim that Schedule B existed and was later lost or destroyed.

Accordingly, the Court finds that the Songwriter's Agreement fails to satisfy the

writing requirement to effect a valid transfer of copyright ownership pursuant to 17

U.S.C. § 204(a).  "Any ambiguities or doubts concerning the scope of rights assigned by

the [authors] . . . must be construed in favor of the [authors]."  *Jim Henson Productions,*

*Inc. v. John T. Brady & Assocs., Inc.*, 16 F. Supp. 2d 259, 285 (S.D.N.Y. 1997); *see also*

*Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1160 (S.D.N.Y. 1996)

("[T]ransfer agreements should be construed in favor of copyright transferor because

section 204(a) reflects the policy judgment that copyright owners should retain all rights

unless specifically transferred." (citing 1 William F. Patry, Copyright Law and Practice at

392)).

 B. Extrinsic Evidence

 Defendants assert that the Court should consider extrinsic evidence to "interpret

and give force to the provisions of the [Songwriter's] Agreement," including Mason's

testimony about certain correspondence between Mason and JMP, as well as royalty

checks and statements Mason received from JMP in connection with its exploitation of

the Composition. (Defs.' Mem. at 5-9, 12-13.)  According to Defendants, this extrinsic

evidence, when considered in its entirety, "establishes that the parties did intend to

transfer the copyrights to [the Composition] to JMP pursuant to the 1965 Songwriter's

Agreement."  (Defs.' Mem. at 9.)

 i. The Parties' Correspondence

 Defendants proffer Mason's testimony about a handwritten letter Mason sent in

July 1984 (the "July 1984 Letter") to Harold Lipsius ("Lipsius"), the former president of

14

JMP, informing him of a third party's use of the Composition.[23]  (*See* Mason Dep. at

148:3-149:25; Maldonado Decl. Ex. J.)   Mason testified that in the July 1984 Letter, she

thanked Lipsius for "looking into this matter which concerns both of us," by which she

meant her business dealings with Lipsius regarding other artists' use of the

Composition.[24]  (Mason Dep. 149:12-157:19.)   Defendants also proffer Mason's

testimony about having received three letters Lipsius wrote to her as president of JMP

along with royalty payments made in conjunction with this correspondence: (1) a March

4, 1997 letter, [25] which informs Mason that JMP has a 62.5% ownership interest in the

---

[23]      According to Frank Lipsius, a vice-president of JMP, his father Harold Lipsius, who passed away
on March 17, 2007, was the person who "was primarily responsible for all of JMP's business dealings"
from 1956 through 2006. (Lipsius Decl. ¶¶ 1,4,5.)  Frank Lipsius has annexed the declaration of his father,
Harold Lipsius, which states "I am the President of Jamie Music Publishing Co. ("JMP") and Jamie Record
Company ("JRC"). (*See* February 8, 2007, Decl. of Harold B. Lipsius ("Harold Lipsius Decl.") (annexed
as Ex.1 to Lipsius Decl.) at ¶ 1.)

[24]      Defendants allege that Mason testified that she "wrote the [Composition] . . . for Harold Lipsius,"
and they proffer evidence of Mason's testimony about the "'really good relationship'" she had formed
with Harold Lipsius that dated back to 1964, in which JMP was "'the distributor/owner'" of Mason's
compositions. (Maldonado Decl.  ¶ 4 (a)-(b) (quoting Mason Dep. at 21:9-25; 22:19-22; 26:5-9, 21-25;
27:2, 20-25; 28:2 ).)  The Court notes that the relevant portion of Mason's testimony actually states that
when Mason would meet with the Guardian, "he would show me different . . . [royalty] statements and
explain what a statement was and the songs that I had written for I would guess, Harold Lipsius." (Mason
Dep. at 27:20-28:2.)  The Court finds that this testimony does not specifically mention that Mason wrote
the Composition for Harold Lipsius.  Moreover, the Court finds that Defendants have failed to
demonstrate that the Composition was a work for hire.  The Copyright Act provides:

> In the case of a work made for hire, the employer or other person for whom the work was
> prepared is considered the author for purposes of this title, and, unless the parties have
> expressly agreed otherwise in a written instrument signed by them, owns all of the rights
> comprised in the copyright.

17 U.S.C.A. § 201(b).  The Act defines a "work made for hire" as: "(1) a work prepared by an employee
within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a
contribution to a collective work . . . ." 17 U.S.C.A. § 101.  Defendants do not claim that Mason wrote the
Composition pursuant to § 101(2).  Defendants also do not claim that Mason was JMP's employee within
the meaning of § 101(1).  *See Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 741, 743
(1989) (holding that a court's determination of whether a hired party is an "employee" is made by reference
to the "general common law of agency").

[25]      The March 4, 1997 letter includes the following caption "RE: Notorious B.I.G. Project READY
TO DIE - 'YES, I'M READY.'"  Defendants have proffered two additional letters from Lipsius to Mason,

Composition while Stilran has a 37.5% interest and that JMP had paid Mason all royalty payments owed by both JMP and Stilran prior to March 4, 1997 (Maldonado Decl. ¶¶ 9-11 & Ex. C; Mason Dep. 105:7-25); (2) a November 23, 1979 letter, which informs Mason of a third party's use of the Composition and her testimony about receiving payments for such use (Maldonado Decl. ¶¶ 13-14 & Ex. E; Mason Dep. 136:15-25, 137:2-15); and (3) Mason's testimony about having received a copy of a November 27, 1995 Sub-Publishing Agreement between Fuji Pacific Music, Inc. and Dandelion Music Co. & Stilran Music (the "Sub-Publishing Agreement") concerning exploitation of the Composition in Japan, as well as a letter dated October 17, 1996, informing her of royalties paid pursuant to that Agreement (Maldonado Decl. ¶¶ 15-16 & Exs. F & G; Mason Dep. 167:16-24, 168:2-17) (collectively the "Letters").  Defendants also proffer Mason's testimony that she received a copy of the Songwriter's Agreement that was sent with a January 25, 1993 letter that was addressed to her from Dandelion Music Co. and signed by Lipsius, which states "You have asked for a copy of your writers [sic] contract for 'YES, I'M READY.'"  (Maldonado Decl. ¶ 4(i)-(j) & Ex. K; Mason Dep. 165:19-166:8.)

    ii.  Royalty Payments

   Defendants assert that royalty statements and royalty checks that Mason received from JMP "should be read in conjunction with the Songwriter's Agreement to constitute a writing transferring [the Composition] and its renewal term to JMP, notwithstanding the fact that the 1965 Songwriter's Agreement did not contain Schedule B, identifying [the Composition] as one of the songs transferred."  (Defs.' Mem. at 13.)  Defendants proffer

---

dated January 14, 1997, and December 4, 1996, respectively, which include the same caption and discuss royalty payments.  (*See* Maldonado Decl. ¶ 9 & Ex. C.)

Mason's testimony that from 1965 through 2006, JMP submitted royalty statements and royalty payments, including advance payments for the Composition, to Mason, her Guardian, or her designated agent.  (Maldonado Decl. ¶ 4 (g).)  Defendants also proffer copies of royalty checks that were payable to Mason and that were marked as advances on the Composition along with Mason's testimony that she understood that these checks constituted advance payments on royalties from JMP.[26]  (Maldonado Decl. ¶¶ 17-19 & Exs. H, I; Lipsius Decl. Ex. 1-D.)  Mason proffers evidence that Lipsius, the person she dealt with at JMP, acted as "Administrator" of the Composition, and sent her royalty statements and collected monies that JMP owed to her for its exploitation of the Composition.  (Mason Dep. (annexed as Ex. I to April 7, 2008 Reply Decl. of Oren J. Warshavksy ("Warshavksy Reply Decl.")) at 160:3-23).)

The Court finds that Defendants' extrinsic evidence does not constitute a written assignment of Mason's copyright ownership, either by itself or when considered in conjunction with the Songwriter's Agreement.  The Parties' correspondence and the royalty checks and statements establish that Mason and JMP were engaged in a business relationship and that JMP exploited the Composition and paid Mason royalties as a result.  "A payment of royalties is as consistent with a license as it is with an assignment, and thus does not in itself imply an assignment." *Jim Henson Productions, Inc. v. John T. Brady & Assocs., Inc.*, 16 F. Supp. 2d 259, 289 (S.D.N.Y. 1997) (citing 3 Nimmer § 10.03[B] at 10-42 n. 33 and *Ilyin v. Avon Publ'ns, Inc.,* 144 F. Supp. 368 (S.D.N.Y. 1956)).  Indeed, the Second Circuit has held that an endorsement on a check was insufficient to meet the writing requirement of § 204(a) and to transfer copyright

---

[26]   Only one of the twenty-four royalty checks proffered by Defendants shows the reverse side with Mason's endorsement.  (*See* Maldonado Decl. Ex. H.)

ownership because the endorsement did not specifically mention copyright. *Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549, 564 (2d Cir. 1995) (deferring to the district court's determination that a legend stamped on checks, which stated that "'payee acknowledges payment in full for the assignment . . . of all right, title and interest in [a painting],'" was "ambiguous because it does not mention the word 'copyright,'" and therefore "insufficient to meet the writing requirement of § 204(a)"); *see also Papa's-June Music, Inc.*, 921 F. Supp. at 1159-60 (holding that that a lyricist's act of endorsing royalty checks did not satisfy the writing requirement of 204(a) and noting that "an agreement concerning royalties does not constitute a 'transfer of copyright ownership' within the meaning of 17 U.S.C. § 101").

Accordingly, the Court finds that Defendants' extrinsic evidence fails to effect a valid transfer of copyright ownership pursuant to 17 U.S.C. § 204(a). *See Papa's-June Music, Inc.*, 921 F. Supp. at 1155-56, 1158 (noting that the Second Circuit has explained that Section 204(a) "protect[s] copyright holders from persons mistakenly or fraudulently claiming oral licenses.'" (quoting *Eden Toys, Inc. v. Florelee Undergarment Co.,* 697 F.2d 27, 36 (2d Cir. 1982) *superseded on other grounds as stated in Weissman v. Freeman*, 868 F.2d 1313 (2d Cir.1989); Fed. R. Civ. P. 52(a))).

C.     The 1965 Copyright Registration Certificates

Defendants assert that the 1965 copyright registration certificates issued by the Copyright Office constitute prima facie evidence of their copyright ownership of the Composition pursuant to § 17 U.S.C. § 410(c).  "In many cases, the existence of a valid copyright can be established by the introduction into evidence of a Copyright Office certificate of registration. Such a certificate, if timely obtained, 'constitute(s) prima facie

18

evidence of the validity of the copyright and of the facts stated in the certificate.'"

*Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir. 1980) (quoting 17 U.S.C.

§ 410(c) and noting "certificate given same effect under 1909 Copyright Act" (internal

citations omitted)); *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090,

1092 n.1 (2d Cir. 1977) ("The Copyright Office certificate of registration is prima facie

evidence of the facts stated therein. 17 U.S.C. § 209). "It is clear, however, that a

certificate of registration creates no irrebuttable presumption of copyright validity. Where

other evidence in the record casts doubt on the question, validity will not be assumed."

*Durham Industries, Inc.*, 630 F.2d at 908.

Defendants obtained the initial copyright registration certificate on March 31,

1965, before Jenkins had been appointed by the Orphan's Court as Guardian. Defendants

obtained the second registration certificate on July 15, 1965, while Mason was apparently

still a minor. (*See supra* n. 6.) As such, these registrations were obtained without prior

approval of the Orphan's Court. Moreover, Defendants have failed to show that they

obtained a valid written assignment of Mason's copyright ownership before these

registration certificates were issued. Even assuming, *arguendo*, that the 1965 copyright

registration certificates establish Defendants' initial copyright ownership during the first

twenty-eight year term of copyright protection, Mason retained a statutory right as author

of the Composition to renew the copyright in her own name at the expiration of that term

in 1993. Accordingly, the Court finds that the 1965 copyright registration certificates do

not constitute prima facie evidence of Defendants' copyright ownership of the

Composition.

19

D.      The 1993 Copyright Renewal Registration

Mason proffers the 1993 renewal registration certificates that she timely obtained

from the Copyright Office as evidence that she owns a presumptively valid copyright in

the Composition.  The Copyright Act provides that:

> If an application to register a claim to the renewed and extended term of
> copyright in a work is made within 1 year before its expiration, and the
> claim is registered, the certificate of such registration shall constitute
> prima facie evidence as to the validity of the copyright during its renewed
> and extended term and of the facts stated in the certificate. The evidentiary
> weight to be accorded the certificates of a registration of a renewed and
> extended term of copyright made after the end of that 1-year period shall
> be within the discretion of the court.

17 U.S.C.A. § 304(a)(4)(B).  Defendants assert that the renewal registration "served only

to renew JMP's copyrights" and that "Mason's own actions after filing the renewal of the

copyright . . . belie her claim that the renewal establishes her ownership of the

Composition. . . . Mason testified that she continued to accept royalty statements, royalty

payments and advance payments from JMP . . . and that her business relationship with

JMP did not change in any way." (Defs.' Mem. at 15-16.)

In 1993, Mason, as a living author of a copyrighted work, was entitled to obtain

the renewal rights to the Composition.  *See* 17 U.S.C. § 304.[27]  "The purpose of the right

of renewal is to 'provide[] authors a second opportunity to obtain remuneration for their

works.'"  *Corcovado Music Corp. v. Hollis Music, Inc.,* 981 F.2d 679, 683 (2d Cir. 1993)

(quoting *Stewart v. Abend,* 495 U.S. 207, 217 (1990)).  "One of the central concepts of

---

[27]      Section 304 of the Copyright Act provides in relevant part:

> Any copyright, the first term of which is subsisting on January 1, 1978, shall endure for
> 28 years from the date it was originally secured. . . .  In the case of any other copyrighted
> work, . . . the author of such work, if the author is still living, . . . shall be entitled to a
> renewal and extension of the copyright in such work for a further term of 67 years.

*Id.* at § 304(a)(1)(C).

20

federal copyright law is that the renewal period is not merely an extension of the original

copyright term but a 'new estate . . . clear of all rights, interests or licenses granted under

the original copyright.'" *P.C. Films Corp. v. MGM/UA Home Video Inc.*, 138 F.3d 453,

456-57 (2d Cir. 1998) (quoting *G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d

469, 471 (2d Cir. 1951)).  However, if an author had assigned the expectancy in the

renewal rights to an assignee prior to the renewal term, the renewal in the author's name

would not alter the status of the parties. *Rose v. Bourne, Inc.*, 176 F. Supp. 605, 609-11

(S.D.N.Y. 1959) ("Title depends not upon the form of registration but upon the actual

ownership of the copyright as renewed.")  While an author can convey his or her

entitlement to a renewal term, "[t]here is a strong presumption against the conveyance of

renewal rights."  *P.C. Films Corp.*, 138 F.3d at 457 (internal citation and quotations

omitted); *accord Guardian Music Corp. v. James W. Guercio Enter., Inc.*, 271 Fed.

App'x 119, 121 (2d Cir. 2008).  "This presumption may be rebutted only 'where the

author includes language which expressly grants rights in renewals of copyright or

extensions of copyright.'"  *Guardian Music Corp.* at 120 (quoting *P.C. Films Corp.*, 138

F.3d at 457); *accord Corcovado Music Corp,* 981 F.2d at 684; *Clark v. Hudson Bay

Music, Inc.*, No. 94 Civ. 6796 (JGK), 1995 WL 600570, at *7-8 (S.D.N.Y. Oct. 12, 1995)

(noting that any ambiguity in a songwriter's contract with a music publisher "should be

construed against the defendants in view of the strong presumption against the

conveyance of renewal rights).  Moreover, "Defendants bear the burden of demonstrating

their rightful claim to the renewal term." *Id.* at *6 (citing *Von Tilzer v. Jerry Vogel Music

Co.*, 53 F. Supp. 191, 196 (S.D.N.Y. 1943), *aff'd sub nom. Gumm v. Jerry Vogel Music

Co.*, 158 F.2d 516 (2d Cir. 1946)).

The Court notes that the Songwriter's Agreement explicitly granted the renewal rights to any songs included within its contractual term; consequently the renewal rights to any songs listed on Schedule B would have been included as well if Schedule B had been annexed to the Agreement. (*See* Songwriter's Agreement ¶¶ 1, 7.) As previously discussed, the Songwriter's Agreement failed to satisfy the writing requirements of § 204(a) to assign Mason's copyright interest in the Composition, and it similarly did not convey Mason's expectancy in the renewal rights to Defendants. Defendants have failed to proffer any evidence of an express grant by Mason of her renewal rights and therefore Mason's continued acceptance of royalty payments and statements and business dealings with JMP after obtaining the renewal certificate in 1993 has no legal significance in the context of assignments of copyright ownership under the Copyright Act. Accordingly, the Court finds that Mason owns a valid copyright to the Composition.

D.     Equitable Defenses

Defendants assert that the equitable doctrines of estoppel and laches preclude Mason's motion for a declaratory judgment of copyright ownership to the Composition because "Mason failed to contest JMP's claimed ownership of [the Composition] in spite of her knowledge of JMP's claim . . . ." (Defs.' Mem. at 17.)

i.     Estoppel

According to Defendants, "Mason knowingly acquiesced in JMP's claimed ownership of [the Composition] for many years, causing JMP to detrimentally rely on her acquiescence," and therefore she should be equitably estopped from claiming ownership of the Composition. (Defs.' Mem. at 19.) "The doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon

22

the other party due to the latter's justifiable reliance upon the former's words or conduct."

*Price v. Fox Entm't Group, Inc.*, No. 05 Civ. 5259 (SAS), 2007 WL 241387, at *3

(S.D.N.Y. Jan. 26, 2007) (internal citations and quotations omitted).  "Estoppel is a

drastic remedy and must be utilized sparingly." *Id.* (internal citation and quotations

omitted).

Defendants assert that Mason is equitably estopped from claiming copyright

ownership because she allegedly assigned her rights through the Songwriter's

Agreement, an assignment which is contested by Mason.[28]  As such, the Court finds that

Defendants' reliance on the Songwriter's Agreement was unreasonable given that the

Agreement contained no mention of the Composition.  *See Fitzgerald Pub. Co. v. Baylor*

*Pub. Co.*, 807 F.2d 1110, 1113-14 (2d Cir. 1986) (rejecting defendant's equitable

estoppel defense to a copyright infringement claim and noting that its reliance on a

contract as authority for changing a copyright notice was unreasonable where the contract

did not assign the copyright or grant a license).

In addition, Defendants' estoppel argument ignores their own failure to comply

with the writing requirement of § 204(a).  As noted by one district court:

> "The requirement of a written transfer contained in Section 204(a)
> enhances the predictability and certainty of copyright ownership and thus
> serves Congress' paramount goal in revising the Copyright Act in 1976.
> *See CCNV v. Reid*, 490 U.S. 730, 749 . . . (1989). . . . Furthermore,
> Plaintiffs are unable to locate a single case in which a court allowed the
> doctrine of equitable estoppel to be used to circumvent the writing
> requirement of Section 204(a) and thus, bestow upon a party substantive
> copyright ownership absent a written agreement to that effect. . . .
> Plaintiffs, who are not the authors of the works at issue, are asking this
> court to transfer ownership to them despite their failure to comply with the
> express requirements for copyright transfer contained in Section 204(a).

---

[28]     This Opinion does not address whether Defendants may avail themselves of an equitable estoppel
defense to any copyright infringement claims that may be raised in relation to the Composition.

23

> As noted above, Section 204(a) contributes to the increased predictability and certainty of copyright ownership and prevents a copyright holder from inadvertently transferring ownership rights. We reject Plaintiffs' request that we apply equitable estoppel to affirmatively transfer to them those rights which originally attached to the creators of the work."

*Pamfiloff v. Giant Records, Inc.*, 794 F. Supp. 933, 937, (N.D. Cal. 1992); *see also Billy-Bob Teeth, Inc. v. Novelty, Inc.*, 329 F.3d 586, 592-93 (7th Cir. 2003) ("As the court said in *Imperial Residential Design*, 'the chief purpose of section 204(a), (like the Statute of Frauds), is to resolve disputes between copyright owners and transferees and to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership.'" (quoting *Imperial Residential Design, Inc. v. Palms Dev. Group, Inc.*, 70 F.3d 96, 99 (11th Cir. 1995))).

Accordingly, the Court concludes that Defendants may not invoke equitable estoppel to bar Mason's claim of copyright ownership.

>          ii.   Laches

Defendants assert that Mason's claim for declaratory judgment may be barred by laches due to Mason's "unreasonable delay" in bringing this action. (Defs.' Mem. at 19.) Defendants allege that JMP has been "deeply prejudiced" because "Mason failed to commence an action to enforce her alleged rights" in the Composition until the commencement of her intervention action in 2006 and in the interim "[k]ey witnesses to JMP's dealings with Mason have died."[29] (Defs.' Mem. at 19.) The essential elements of the equitable doctrine of laches "are unreasonable delay by a plaintiff and resulting harm

---

[29]      Defendants state that Mason's Guardian, Jenkins, "who informed Mason that the 1965 Songwriter's Agreement included musical compositions that Mason had composed prior to execution of the Agreement," and Lipsius, "who was primarily responsible for negotiating the Songwriter's Agreement and for JMP's business dealings with Mason," are both deceased. (Defs. Mem. 19-20; Lipsius Decl. ¶¶ 5, 12.)

24

to the defendant." *Eyal R.D. Corp. v. Jewelex New York, Ltd.*, 576 F. Supp. 2d 626, 644 (S.D.N.Y. 2008).

The Court rejects laches as a bar to Mason's claim.  First, Defendants have failed to show any "unreasonable delay" on Mason's part in enforcing her right to be declared the owner of the copyright to the Composition.  "Mere delay is not, in and of itself, sufficient to bar a claim. . . . [T]he focus is on the reasonableness of the delay rather than on the number of years that have elapsed." *Armstrong v. Virgin Records, Ltd.*, 91 F. Supp. 2d 628, 643-44 (S.D.N.Y. 2000) (internal citations and quotations omitted).  Mason's timely 1993 copyright renewal registration proclaimed her copyright ownership in the Composition.  "A copyright registration certificate in the Copyright Office provides constructive notice as to the ownership of the copyright and the facts stated in the registration certificate." *Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church*, 499 F.3d 32, 40 (1st Cir. 2007) (internal citation and quotations omitted); *Johnson v. Jones,* 149 F.3d 494, 505 (6th Cir.1998) ("Constructive notice of a valid copyright is presumed upon registration."); *Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.*, 119 F.3d 55, 66 (1st Cir.1997) ("A copyright registration certificate issued by and filed with the Copyright Office thus serves to put the world on constructive notice as to the ownership of the copyright and of the facts stated in the registration certificate.").   The Court finds that Mason had no reason to bring a declaratory action to establish her copyright ownership and therefore Defendants cannot establish the unreasonableness prong of laches.

Second, the Defendants have reaped handsome profits for many years from their exploitation of the Composition.  According to Defendants, they have "derive[d] a

25

substantial percentage of their revenues" from licensing the Composition, which has been one of Defendants' "greatest commercial assets . . . ." (JMP's Compl. ¶¶ 1, 19.) The only prejudice that Defendants claim to have suffered is their inability to present the testimony of deceased witnesses about matters before this Court in the instant motion and related litigation. This testimony would not change the Court's decision with respect to the copyright ownership of the Composition as it would not alter the writing requirement of § 204(a). As such, Defendants have failed to establish the prejudice prong of laches.

Lastly, the Court notes that "one who seeks Equity's assistance must stand before the court with clean hands." *Stone v. Williams*, 891 F.2d 401, 404 (2d Cir. 1989) (internal citation and quotations omitted); *Lennon v. Seaman*, 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999) (noting a defense of laches "is often unavailable to those who have 'unclean' hands"). The Court concludes that Defendants may not avail themselves of these equitable defenses based upon Defendants' conduct in obtaining the initial 1965 copyright registration certificates while Mason was a minor, prior to the appointment of the Guardian and without seeking the approval of the Orphan's Court. "Courts enforce the doctrine of unclean hands 'where the party asking for the invocation of an equitable doctrine has committed some unconscionable act that is directly related to the subject matter in litigation and has injured the party attempting to invoke the doctrine.'" *Price*, 2007 WL 241387, at *4 (quoting *PenneCom, B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir.2004).

CONCLUSION

For the reasons stated above, the Court finds that Defendants have failed to raise a genuine issue of material fact with respect to Mason's ownership of the copyright to the

Composition.  Accordingly, the Court grants Mason's motion for summary judgment and

declares that Mason is the owner of the copyright in the Composition subject to the terms

of the Purchase Agreement.   The Clerk of Court is directed to terminate the motion

documented as docket number 42.  The Parties are hereby instructed to appear before this

Court for a conference on September 22, 2009 at 2:30 p.m. at Courtroom 17C at 500

Pearl Street, New York, New York, 10007.

SO ORDERED.

Dated: New York, New York
       September 16, 2009

_____
BARBARA S. JONES
United States District Judge

27